PAUL A. BONIN, Judge.
11 Kristin Hunter appeals his manslaughter conviction for the intentional killing of his lover and roommate, Marcel Ivory. He also appeals the sentence of forty years at hard labor imposed upon him following his adjudication as an habitual offender.
With respect to his conviction, he first assigns as error that the evidence is insufficient to support the jury’s necessary finding beyond a reasonable doubt that his killing of Mr. Ivory was not justified as self-defense. He second assigns as error that the trial judge erred in admitting evidence at the request of the prosecution of an earlier violent encounter and, once having admitted the evidence, in failing to instruct the jury regarding such evidence. We have reviewed the. first assignment under the well-known Jackson v. Virginia standard and conclude that any rational fact-finder could find beyond a reasonable doubt that the killing of Mr. Ivory by Mr. Hunter was not justified. We have reviewed the ruling admitting the other bad-act evidence under an abuse-of-discretion standard and find no abuse; we have reviewed the complaint regarding the jury instruction and find that Mr. RHunter, having failed to object to the jury instructions, did not preserve that complaint for our review. Accordingly, we affirm Mr. Hunter’s conviction for manslaughter.[1]
With respect to his sentence, Mr. Hunter primarily assigns as error that the trial judge erred as a matter of law in finding that he had been previously convicted of a felony in Florida based upon documentation showing that the adjudication of guilt on the charge of burglary was withheld. He additionally assigns as error that the sentence of forty years at hard labor imposed as a result of his adjudication as an habitual offender is excessive and, alternatively anticipating the vacating of his adjudication as a second-felony "offender, that the original sentence of thirty-five years at hard labor is excessive. We have reviewed the habitual offender adjudication as a question of law and, in accord with the prosecution’s confession of error, conclude that the trial judge incorrectly adjudicated Mr. Hunter as a second-felony offender. Accordingly we vacate that ruling. Thus, his complaint about the excessiveness of' the forty-year sentence is moot. Because he failed to file a motion to reconsider the original sentence, he failed to preserve the issue of excessiveness for our review. And, because the thirty-five-year sentence is a legal sentence, we accordingly reinstate the original sentence.
We explain our decision in greater detail below.

*533
Ji

In this Part, we begin by addressing the evidence which the jury considered in reaching its verdict that Kristin Hunter intentionally killed Marcel Ivory and that the killing was not justified. And because we are undertaking a sufficieney-of-evi-dence review under Jackson v. Virginia[2], we consider the entirety of the evidence before the fact-finder, including even evidence which may have been erroneously admitted in the trial .court. See State v. Hearold, 603 So.2d 731, 734 (La.1992).
In his taped statement to police investigators, the defendant referred to the decedent as his “lover,” “roommate,” and “partner.” They had been living together, for about four months in an apartment which Mr. Hunter rented.' Hiving in an adjoining apartment were Alex Bernard and Susan Miller, both of whom testified that they were able to hear through the common interior wall when Mr. Hunter and Mr. Ivory were arguing or shouting with each.
Mr. Hunter, who did not testify at trial, did freely admit in his statements to police that he stabbed Mr. Ivory near his collarbone with a kitchen knife. Mr. Hunter is clear that he intended to stab Mr. Ivory but stated that he did not intend to kill him. Mr. Hunter also admitted that at no time during their final confrontation was Mr. Ivory armed with any weapon or any other dangerous instrumentality.
l/The offense of manslaughter includes the killing -of a human being “[w]hen the offender has the specific intent to kill or inflict great bodily harm” but the killing “is . committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection.” La. R.S. 14:30.1A(1), 31 A(1). Noteworthy, however, is that “sudden passion” and “heat of blood” are not elements of the offense of manslaughter; they are only mitigating factors lessening the culpability of a defendant. See State v. Lombard, 486 So.2d 106, 110 (La.1986). Mr. Hunter does not, of course, contest the sufficiency of the evidence with respect to the jury’s findings regarding the essential elements of the offense of manslaughter.
Instead his défense is that his killing of Mr. Ivory is justifiable because it was committed under the circumstances described in La. R.S. 14:20. See La. R.S. 14:18(7). “A homicide is justifiable*[] [w]hen cdm-mitted in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.” La. R.S. 14:20 A(1) (emphasis added). Invocation of the justification defense is not unqualified, however. “A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict.” La. R.S. 14:21.
UWhen a defendant in . a homicide prosecution claims self-defense, the burden is on the prosecution to prove, beyond a reasonable doubt that the defendant did not act in self-defense. See State v. Taylor, 03-1834, p. 7 (La.5/25/04), 875 So.2d 58, 63, citing to State v. Brown, 414 So.2d 726, 728 (La.1982). And it is on this point that Mr. Hunter stakes his claim of legal *534 insufficiency of the evidence to support his conviction. See, e.g., State v. Rubens, 10-1114, p. 7 (La.App. 4 Cir. 11/30/11), 83 So.3d 30, 38. See also State v. Smith, 11-0664, pp. 11-12 (La.App. 4 Cir. 1/30/13), 108 So.3d 376, 384-85.
A
Mr. Hunter offered his version of the events which resulted in the lethal stabbing. Mr. Ivory had gone to a nearby store with their neighbor, Mr. Bernard, and returned home intoxicated. He and the defendant spent time abed, drinking wine. They were alone in their apartment. Claiming that he was still under the effects of alcohol and that the prescription medications he took affected his memory, Mr. Hunter could not at first specifically recall what set Mr. Ivory into a rage. When pressed by the detective questioning him, Mr. Hunter remembered an argument about a piece of jewelry he was wearing which was a gift from a former lover who was then imprisoned. Mr. Hunter explained that Mr. Ivory was extremely jealous of that former lover and of other former lovers, including (according to Mr. Hunter) the neighbor Mr. Bernard.
Without any other provocation, Mr. Ivory began to hit and beat him fiercely. Mr. Hunter vainly begged Mr. Ivory, a younger and larger man, to stop. He | (¡recalled seeing a look of “sheer hatred” on Mr. Ivory’s face during the relentless beatings. Mr. Hunter managed to get away from Mr. Ivory and, fleeing to the kitchen, took hold of the knife, believing that this would stop the attacks. Mr. Ivory continued to beat him in the kitchen, however, and Mr. Hunter stabbed him. Mr. Ivory then stumbled back into the living room, where he collapsed. He was found supine on the living room floor, with the knife nearby, and the room in disarray.
Detective Robert Barrere, who was the first on the scene, testified that he observed Mr. Hunter to have some minor swelling on his face, an abrasion on his eye, and blood on his lip. He stated that it looked like ■ Mr. Hunter had “been in a physical confrontation.” Detective Theo-philus Kent, who observed the defendant at police headquarters, testified that he had a minor laceration near his eye and a small blood stain near* his ear. He also stated that Mr. Hunter declined medical treatment and did not appear to be in pain at the tíme.
Mr. Hunter explained to police that the fight between him and Mr. Ivory that evening had been the “worst” they had during their four-month involvement with each other. He also recalled other incidents of violence throughout the relationship. In July of 2012, the couple had an altercation in Jackson Square, where Mr. Ivory hit him in the face and then fled the scene. Mr. Hunter said he called the police but was unsure if a police report had been filed. Officer Douglas Butler, who responded to the Jackson Square incident, testified to a different version of events. When the officer arrived, both men were present and appeared 17to have been drinking. Mr. Hunter stated that Mr. Ivory hit him several times and demanded that the officer arrest him. When Officer Butler informed Mr. Hunter that he would not be arresting Mr. Ivory, Mr. Hunter became belligerent and combative and began making “derogatory” remarks to Mr. Ivory. Throughout the encounter, the officer described Mr. Ivory as being calm and “easy to talk to.” Officer Butler arrested Mr. Hunter after being forced to physically restrain him. Because Mr. Hunter then made several comments about killing himself, the officer brought him to University Hospital for a mental evaluation.
*535 Mr. Hunter told police that the second incident occurred approximately two weeks before the stabbing, where an intoxicated Mr. Ivory pushed him into a garbage can, resulting in a severe back injury. Mr. Hunter did not call the police on that occasion, nor did he go to the hospital.[3]
Alex Bernard and Susan Miller, Mr. Hunter’s neighbors at the time of the incident, both offered their version of events on the day Mr. Ivory was killed. Mr. Bernard admitted that he had four prior felonies and that he was currently incarcerated on a pending charge of aggravated battery. On the day of the incident, Mr. Ivory asked Mr. Bernard to go with him to the store. Before they left, Mr. Hunter emerged from his apartment and appeared upset that Mr. Ivory was leaving. After returning from the store, the two men went their separate ways, and Mr. Bernard later observed the couple talking outside their apartment. They did not | ^appear to be in a heated or argumentative discussion at that time. Shortly thereafter, Mr. Bernard was in his bathroom when he heard what sounded like fighting in the next-door apartment occupied by Mr. Hunter. He admitted that although his kitchen is the only room which shares a wall with Mr. Hunter’s residence, because his apartment is very small and the walls are thin he was able to hear quite well from his position in the bathroom. Specifically, Mr. Bernard testified that he heard Mr. Ivory “yelling, saying like stop, quit, you know, ouch” and he was certain it was Mr. Ivory’s voice.[4] When Mr. Bernard relocated to his kitchen, the argument next-door had ceased, but he did remember hearing “heavy breathing.”
Mr. Bernard and his neighbors would often drink alcohol together. He described Mr. Hunter as belligerent and aggressive when drinking, and Mr. Ivory as “jolly” and “elated,” though sometimes Mr. Ivory would drink to the point where he was unhappy. Although Mr. Bernard never witnessed either man physically or verbally abuse one another, he did believe Mr. Hunter to be the jealous one in the relationship. In the past, he overheard Mr. Hunter threaten to kill Mr. Ivory if he ever cheated. Mr. Bernard related this threat to Detective Travis Ward, who interviewed him at the scene. The detective stated that the threat, as relayed by Mr. Bernard, was essentially, “If I catch you cheating on me, |J’m going to put you to sleep.” Mr. Bernard also denied having any kind of sexual or romantic relationship with the defendant.
Susan Miller, Mr. Bernard’s fiancee at the time, stated that Mr. Bernard was a “liar and a thief.” She was in the kitchen when she heard the fighting begin next-door. She did not hear Mr. Hunter make any threats and did not remember hearing Mr. Ivory say “stop” or “ouch.” Ms. Miller also emphasized that she would have been in a better position to hear the commotion in Mr. Hunter’s apartment than Mr. Bernard. She never observed Mr. Hunter act belligerent when drinking and stated that Mr. Ivory was the jealous per *536 son in the relationship. Although she testified that Mr. Hunter never told her Mr. Ivory beat him, she later recalled that he did in fact tell her Mr. Ivory hit him on the night in question.
Dr. Cynthia Gardner, who conducted the autopsy on Mr. Ivory, testified that he suffered two distinct injuries: a stab wound to the chest and a superficial trauma wound on the palm of his left hand. She testified that the wounds were most likely sustained at the same time and both caused' by a sharp object. Dr. Gardner stated that Mr. Ivory’s hand would have been open when he suffered the palm injury, and that it was consistent with a defensive wound. On cross-examination, she admitted that the wound could have been inflicted if Mr. Ivory was attempting to reach for the knife.
B
Applying the Jackson standard in the instant case, any rational fact-finder could conclude that Mr. Hunter was guilty beyond a reasonable doubt of | ^manslaughter and that the prosecution proved' beyond a reasonable doubt that he did not act in self-defeiise when he fatally stabbed Mr. Ivory. When viewed in the light most favorable to the prosecution, a rational fact-finder could have found that Mr. Hunter did not reasonably believe he was in imminent danger of losing his life or receiving great bodily harm, or that the killing was necessary to save himself from such danger. First, Mr. Ivory was never armed during the incident. See Smith, supra (evidence indicating the victim received defensive-wounds to his hand and that he was unarmed at all times negated defendant’s claim of self-defense). Next, Mr. Hunter appeared to have only sustained minor injuries, even though he claimed that Mr. Ivory relentlessly beat him and that this altercation was the worst fight they had during their tumultuous relationship. See State v. Miller, 14-0406, p. 30 (La.App. 4 Cir. 2/25/15), 160 So.3d 1069, 1088 (the lack of apparent injuries on defendant’s body and his lack of complaints about any pain when he alleged victim beat him “savagely” was an important factor in determining that state proved defendant did not act in self-defense). Finally, although there were no witnesses to the actual stabbing, testimony from Mr. Bernard indicated that prior to the altercation with Mr. Hunter, Mr. Ivory was not upset and did not appear drunk even though he- had been drinking. See Rubens, 10-1114, p. 10, 83 So.3d at. 40 (evidence that the victim was not upset or angry prior to meeting with defendant and that victim .was only in the ropm with defendant for moments before he was shot did not support defendant’s claim,of self-defense)., , -
^Alternatively, a rational trier of fact could have found that Mr. Hunter was the aggressor in this situation. The prosecution -presented- testimony that indicated Mr. Hunter was the jealous one in the relationship and had made previous threats of violence against Mr. Ivory. There was also evidence presented that, when drinking, Mr. Hunter would become belligerent and aggressive. Mr. Hunter freely admitted that he had been drinking quite heavily on the day in question. Mr. Bernard testified that he heard Mr. Ivory yelling “stop” and “ouch:” Even though Ms. Miller’s statements did not corroborate Mr. Bernard’s, the jury evidently did not find her testimony credible. Further, Mr. Ivory had what appeared to be a defensive wound on his open palm. The jury therefore could have concluded that Mr. Hunter was precluded from claiming self-defense. See La. R.S. 14:21.
As the trier of fact, a jury is free to accept or reject, in whole or in part, the *537 testimony of any witness. See State v. Dorsey, 10-0216, p. 45 (La.9/7/11), 74 So.3d 603, 635; State v. Johnson, 09-0259, p. 7 (La.App. 4 Cir. 9/16/09), 22 So.3d 205, 210. Importantly, the standard of review calls for a determination of whether “any5’ — and not “every” — rational fact-finder could have found proof of all the essential elements beyond a reasonable doubt. See Johnson v. Louisiana, 406 U.S. 356, 362, 92 S.Ct. 1620, 1625, 32 L.Ed.2d 152 (1972) (“Jury verdicts finding guilty beyond a reasonable doubt are regularly sustained even though the evidence was such that the jury would have been justified in having a reasonable doubt.”). In this case, the jury clearly chose to believe the evidence and testimony that contradicted Mr. Hunter’s self-defense claim. And, given the evidence discussed 112above, it does not appear that the jury’s credibility findings were clearly contrary to the evidence.
II
In this Part, we address Mr. Hunter’s claim that the trial court erred by admitting evidence of a previous altercation between him and Mr. Ivory.
Generally, courts may not admit evidence of other crimes to prove a person’s bad character or to show that he acted in conformity therewith. La. C.E. art. 404 B(1); State v. Prieur, 277 So.2d 126, 128 (La.1973); State v. Lawrence, 09-1637, p. 7 (La.App. 4 Cir. 8/25/10), 47 So.3d 1003, 1007-08. Evidence of other crimes, wrongs, or acts committed by the defendant is generally inadmissible because of the “substantial risk of grave prejudice to the defendant.” Prieur, 277 So.2d at 128. Even so, the prosecution may introduce evidence of other crimes, wrongs, or acts if it establishes an independent and relevant reason such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. See La. C.E. art. 404 B(1). When the other crimes evidence is offered for such a purpose, however, the evidence is not admissible unless it tends to prove a material fact at issue or to rebut a defendant’s defense, and its probative value must outweigh its prejudicial effect. See La. C.E. art. 403; State v. Hardy, 14-1569, pp. 1-2 (La.11/21/14), 154 So.3d 537, 538. Moreover, a trial court’s ruling on the admissibility of evidence pursuant to La. C.E. art. 404 B(1) will not be disturbed absent an abuse of discretion. See State v. Altenberger, 13-2518, p. 8 (La.4/11/14), 139 So.3d 510, 515-16; Lawrence, 09-1637, p. 8, 47 So.3d at 1008.
A
When Officer Butler arrived at Jackson Square in July of 2012, he encountered an agitated and intoxicated Mr. Hunter who claimed that Mr. Ivory had struck him multiple times. The officer testified that Mr. Hunter was belligerent and combative, and made derogatory comments to Mr. Ivory, who did not retaliate. The officer stated that Mr. Hunter either wanted Mr. Ivory to return home with him or be arrested, but Mr. Ivory refused to accompany Mr. Hunter. When Officer Butler declined to arrest Mr. Ivory and instead attempted to arrest Mr. Hunter, the defendant attempted to break away and had to be physically restrained. The officer also testified that although both men appeared to be drinking, Mr. Ivory was calm and compliant.
Mr. Hunter argues that evidence about the Jackson Square incident was prejudicial, irrelevant, and did not serve any purpose under La. C.E. art. 404 B. Further, he claims that the erroneous admission of this evidence was not harmless: during the first trial, which ended with a deadlocked jury, the prosecution did not introduce the prior incident, and therefore its introduc *538 tion in this case substantially contributed to the verdict.[5]
| uThe prosecution asserts that the evidence was introduced to show motive, intent, and absence of mistake, in accordance with La. C.E. art. 404 B. It also argues the evidence demonstrated the defendant’s pattern of violence against the victim, and his volatile and aggressive nature, all of which would rebut Mr. Hunter’s claim of self-defense.
In similar cases involving a defendant and victim who were in a romantic relationship, the Louisiana Supreme Court has found that evidence of prior abuse, threats, and incidents of violence were relevant to show motive and intent. See State v. Rose, 06-0402, p. 15 (La.2/22/07), 949 So.2d 1236, 1245 (evidence that the defendant previously physically abused the victim was admissible to show motive for her murder and to demonstrate the volatile nature of their relationship); State v. Walker, 394 So.2d 1181, 1183-84 (La.1981) (evidence that defendant and victim had a volatile relationship and that defendant had a bad temper was relevant to show the commission of the offense and intent). In a case in which prior acts of violence by both the defendant and victim were introduced, the Court found that “the state could not place the circumstances of the offense in then-proper context without reference to the nature of the relationship existing between the victim and the defendant.” State v. Welch, 615 So.2d 300, 303 (La.1993). Additionally, the Court has found that evidence of prior domestic violence may be admitted to prove a material fact at issue, namely the “nature of the prior relationship between the parties in regard to defendant’s motive for committing the crime.” Walker, 394 So.2d at 1184-85.
uWe first determine whether the trial court properly admitted evidence of the Jackson Square incident for the purpose of establishing intent. Before other crimes evidence can be admitted as proof of intent, three prerequisites must be met: (1) the prior acts must be similar; (2) there must be a real and genuine contested issue of intent at trial; and (3) the probative value of the evidence must outweigh its prejudicial effect. Lawrence, 09-1637, p. 9, 47 So.3d at 1008-09, citing to State v. Blank, 04-0204, p. 41 (La.4/11/07), 955 So.2d 90, 124. In the instant case, several similarities are present: the incidents were domestic altercations, the defendant had consumed alcohol, the defendant claimed that Mr. Ivory hit and attacked him, and the defendant became emotionally distraught and threatened to harm himself after the fact. Further, a manslaughter conviction requires the prosecution to prove the element of specific intent. La. R.S. 14:31 A(1).[6]
The evidence also tended to establish motive and to rebut Mr. Hunter’s claim *539 that he stabbed Mr. Ivory in self-defense. Although the defendant and the victim had been together only four months, the evidence revealed their volatile relationship and Mr. Hunter’s possessiveness and aggressiveness towards his partner, especially when drinking heavily. See Altenberger, 13-2518, p. 10, 139 So.3d at 516 (evidence of “defendant’s pattern of domestic abuse goes directly to rebut defenses defendant may raise at trial and demonstrates their independent relevancy besides merely painting defendant as a bad person.”). Though both men were issued summonses for disturbing the peace, the evidence of Mr. Hunter’s behavior was relevant to put the instant offense in the context of his relationship with Mr. Ivory. See Welch, supra.
As to Mr. Hunter’s complaint that the evidence was unfairly prejudicial, in this ease, no witnesses were present to corroborate Mr. Hunter’s version of events. Therefore, any evidence introduced about the nature of his relationship with the victim was extremely probative. As discussed above, both incidents shared many characteristics, and tended to show intent, motive, and to negate Mr. Hunter’s claim of self-defense. As such, it cannot be said that the prejudicial effect of the evidence outweighed its probative value.
Considering the foregoing, we find the trial court did not abuse its discretion when it allowed the prosecution to introduce evidence of a prior altercation between Mr. Hunter and Mr. Ivory.
B
Mr. Hunter also raises an alternative argument in the event that we find the evidence properly admitted. He claims that the trial judge erred by failing to instruct the jury about the limited purpose under which to consider the other crimes evidence, at the time of Officer Butler’s testimony and at the end of trial, prior to | ^deliberations. Mr, Hunter alleges that he specifically requested a limiting instruction in his written opposition to introduction of the Prieur evidence.
In Prieur, the Louisiana Supreme Court set forth certain safeguards “to be applicable ... to all criminal cases tried after the date of the finality of judgment in this case.” Most relevant to our- inquiry in this case are the following two requirements:
(4) When the evidence is admitted before the jury, the court, if requested by defense counsel, shall charge the jury as to the limited purpose for which the 'evidence is received and is to' be considered.
Moreover, the final charge to the jury shall contain a charge of the limited purpose for which the evidence was received, and the court shall at this time advise the jury that the defendant cannot be convicted for any charge other than the one named in the indictment or one responsive thereto.
Prieur, 277 So.2d at 130. Subsequent jurisprudence has affirmed that these requirements remain in place. See e.g., State v. Miller, 98-0301, p. 4 (La.9/9/98), 718 So.2d 960, 962; State v. Keys, 12-1177, pp. 18-19 (La.App. 4 Cir. 9/4/13), 125 So.3d 19, 34.[7] Importantly for our purposes, a defendant’s failure to request a limiting instruction or to object to the jury instructions waives any claim based on such. See Keys; see also La. C.Cr.P. art. 801 C (“A *540 party may not assign as error the giving or failure to give a jury charge or any portion thereof unless an objection thereto is made before the jury retires or within such time as the court may reasonably cure "the alleged error.”); La. C.Cr.P. art. 841 A (“An irregularity or |1Rerror cannot be availed of after verdict unless it was objected to at the time of occurrence.”).
Mr. Hunter’s written request for a limiting instruction was stated as follows: “If , the Court should admit any bad acts evidence, Mr. Hunter is entitled to, and reserves his right , to request, an instruction to the jury ‘as to the limited purpose for which the evidence is received and is to be considered.’ ” This statement, however, does not necessarily qualify as an unambiguous request for a jury instruction, but appears to merely reserve the right to make one in the future. Even assuming it does constitute a request, the record reveals that at no time before, during, or after Office^ Butler’s testimony did the defendant request the court to issue a limiting instruction. Moreover, although a copy of the jury instructions is not included, the record reveals Mr. Hunter failed to object to the final jury charge, despite being given several opportunities to do so. Consequently, he is precluded from raising this issue on appeal.
Ill
' We now turn in this Part to treating Mr. Hunter’s three assignments of error which pertain to his sentencing.
A
Mr. Hunter argues that the trial judge incorrectly adjudicated him a second-felony offender because he had not been previously convicted of a felony at the time he killed Mr. Ivory.[8] See La. R.S. 15:529.1 A (the underlying felony . | ^conviction must have been committed “after” the predicate felony convicted to punish the offender under the habitual offender law).
In th¿ trial court, the prosecution presented documentation in an effort to establish that Mr. Hunter had been previously convicted of a felony in the State of Florida. That documentation, however, clearly showed that, notwithstanding Mr. Hunter’s plea of guilty to the offense, “the adjudication of guilt was withheld” by the Florida trial court.
Here, on appeal, the prosecution points to Florida jurisprudence which provides that “a defendant who has adjudication of-guilt withheld and successfully completes the term of probation imposed ‘is not a convicted person.’ ” State v. Gloster, 703 So.2d 1174, 1176 (Fla.Dist.Ct.App.1997), approved sub nom. Raulerson v. State, 763 So.2d 285 (Fla.2000) (citing Thomas v. State, 356 So.2d 846, 847 (Fla.Dist.Ct.App.1978), cert. denied, 361 So.2d 835 (Fla.1978)). Conceding that the documentation introduced into evidence at the multiple bill hearing does not satisfactorily evidence that Mr. Hunter was ultimately adjudged guilty and thus that it did not carry its burden of proof, the prosecution confesses error.
We accept the prosecution’s confession of error and vacate the trial judge’s adjudication of Mr. Hunter as a second-felony offender. We also vacate the forty-year sentence imposed under the habitual offender adjudication. See State v. *541 Ian Vincent, unpub., 09-0747 (La.App. 4 Cir. 10/21/09), 24 So.3d 1037 .(Table) (text-2009 WL 8677727) (state conceded on appeal that it presented insufficient proof at habitual offender hearing to establish that ten-year cleansing period had not elapsed; “For the foregoing reasons, the adjudication of Virtis Vincent as a multiple offender and the accompanying five year sentence are hereby vacated, and the original sentence of three years is reinstated.”).
B
Mr. Hunter also assigns as error that the forty-year sentence imposed upon him as an habitual offender is excessive. But, of course, having vacated that sentence, we need not consider, this assignment of error.
C
Anticipating that we might vacate the forty-year sentence, Mr. Hunter argues that the initial thirty-five sentence imposed is excessive. Mr. Hunter, however, did not file a motion to reconsider that sentence. See La. C.Cr.P. art. 881.1 A(1) (“In felony cases, within thirty days following the imposition of sentence or within such longer period as the trial court may set at sentence, the state or the defendant may make or file a motion to reconsider sentence.”). The motion to reconsider, if made at the time of sentencing, shall be oral, and if later made, shall be in writing. See La. C.Cr.P. art. 881.1 B., But the motion to reconsider “shall set forth the specific grounds on which the motion is based.” Id. We have reviewed the transcript of the sentencing hearing and the record of the written motions filed in the district court. Mr. Hunter did not urge such a motion, oral or written.
| ^Importantly, the “[failure to make or file a motion to reconsider sentence or to include a specific ground upon which a motion to reconsider sentence may be based, including a- claim of excessiveness, shall preclude the state or the defendant from raising an objection to the. sentence ... on appeal or review.” La. C.Cr.P. art. 881.1 E (emphasis added). Having failed to move for reconsideration of his thirty-five year sentence, Mr. Hunter has not preserved his claim of excessiveness for our review and disposition.
A person convicted of manslaughter under these circumstances on the date that Mr. Hunter, committed the offense “shall be imprisoned at hard labor for not more than forty years.” La. R.S. 14:31 B. The thirty-five year sentence at hard labor initially imposed upon Mr. Hunter was authorized by statute and does not contain an illegal term. Thus it is a legal sentence. See State v. Mead, 14-1051, pp. 6-7 (La.App. 4 Cir. 4/22/15), 165 So.3d 1044, 1048-49. Accordingly, we reinstate the thirty-five year sentence. See State v. Cureaux, 12-0335, p. 17 (La.App. 4 Cir. 5/1/13), 116 So.3d 833, 842 (no habitual offender bill of information in record; -habitual offender adjudication and sentence vacated, original sentence reinstated); State v. Pierce, 11-0095, p. 12 (La.App. 4 Cir. 8/31/11), 89 So.3d 1, 15 (on rehearing) (documents introduced at habitual offender hearing missing from record on appeal; habitual offender adjudication and sentence vacated, original sentence reinstated).[9]
| ¡^DECREE
We affirm the manslaughter conviction of Kristin Hunter for the killing of Marcel Ivory. We vacate the adjudication of Kristin Hunter as an habitual offender and the *542 sentence of forty years imprisonment at hard labor imposed thereunder. We reinstate the initial sentence of thirty-five years at hard labor.
CONVICTION AFFIRMED; HABITUAL OFFENDER ADJUDICATION AND SENTENCE VACATED; ORIGINAL SENTENCE REINSTATED.

. As we always do, we have examined the record for any errors patent. See La. C.Cr.P. art. 920(2). We have detected none.

. 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). See also La. C.Cr.P. art. 821 B ("A post verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in the light most favorable to the state, does not reasonably permit a finding of guilty.”).

. Throughout his statements to police, Mr. Hunter appeared emotionally distraught. He also made several statements indicating that he would hurt himself if Mr. Ivory was dead. Therefore, as a precaution, the officers brought him to University Hospital for a psychiatric evaluation. He was eventually released from the hospital and arrested in the days that followed.

. Notably, during his statement to police, Mr. Hunter stated that he screamed "stop” and "stop hitting me” when Mr. Ivory attacked him in the living room. Mr. Bernard, however, was adamant that it was Mr. Ivory's voice he heard yelling “stop.”

. Additionally, Mr. Hunter argues the Jackson Square incident was sufficiently dissimilar to the incident in question and therefore did "not prove a pattern.” Presumably, the defendant is claiming that these events do not demonstrate a modus operandi on his part. See e.g., State v. Hills, 99-1750, pp. 5-6 (La.5/16/00), 761 So.2d 516, 520-21.

. The only type of manslaughter which does not require the specific intent to kill or inflict great bodily harm is a homicide committed
(a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person; or
When the offender is resisting lawful arrest by means, or in a manner, not inherently dangerous, and the circumstances are such that the killing would not be murder under Article 30 or 30.1.
La. R.S. 14:31 A(2). None of the above circumstances were alleged to have occurred in this case.

. Notably, however, the failure of a trial judge to give the requested instruction under Prieur does not require automatic reversal. See State v. Sanders, 93-0001, p. 14 (La.11/30/94), 648 So.2d 1272, 1284 (not every violation of pre-trial procedure, including Prieur violations, requires reversal, and a defendant must show prejudice to prevail on claim).

. Mr. Hunter also argues that the felony offense of "burglary of structure,” a violation of Fla. Stat. 810.02(4), would hot be a felony "if committed in this state” (see La. R.S. 15:529.1 A) and thus precludes application of the habitual offender law. Because of the prosecution’s confession of error with respect to the documentation presented at the multiple bill hearing, we do not need to address this argument.

. The prosecution in brief requested remand to conduct another multiple bill hearing, but a remand is unnecessary. See State v. Williams, 14-2651 (La.3/6/15), 162 So.3d 372, (Crichton, J., concurring).